UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SHAKIRA QUINONES GUZMAN,        :
                                :CIVIL ACTION NO. 3:17-CV-1222
          Plaintiff,            :
                                :(JUDGE CONABOY)
          v.                    :
                                :
NANCY A. BERRYHILL,             :
Acting Commissioner of          :
Social Security,                :
                                :
          Defendant.            :
                                :

_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI. (Doc. 1.) Plaintiff protectively filed applications for benefits in November 2015 alleging a disability onset date of August 25, 2015. (R. 9.) After she appealed the initial denial of the claims, a hearing was held on February 17, 2017, and Administrative Law Judge ("ALJ") Patrick Cutter issued his Decision on March 13, 2017, concluding that Plaintiff had not been under a disability during the relevant time period. (R. 16.) Plaintiff requested review of the ALJ's decision which the Appeals Council denied on June 5, 2017. (R. 1-5.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 1.)

Plaintiff filed this action on July 12, 2017. (Doc. 1.) She asserts in her supporting brief that the Acting Commissioner's

determination is error for the following reasons: 1) substantial evidence does not support the ALJ's step two determination; 2) the ALJ's RFC assessment is not supported by substantial evidence; 3) substantial evidence does not support the ALJ's evaluation of Plaintiff's diabetes; 4) substantial evidence does not support the ALJ's step four evaluation; and 5) the ALJ's multiple symptom evaluation errors require reversal. (Doc. 9 at 2.) After careful review of the record and the parties' filings, the Court concludes this appeal is properly denied.

## I. Background

Plaintiff was twenty-one years old on the alleged disability onset date. (R. 9 at 3.) She has a high school education and reports past relevant work as a fast food worker, collector, salesperson, nurse assistant, hand packager, and medical assistant. (*Id.*) Plaintiff alleges that her inability to work is limited by diabetes, high blood pressure, high cholesterol, high triglycerides, and acute pancreatitis. (R. 165.)

### A. Medical Evidence

On December 31, 2014, Plaintiff was seen at the emergency room at Pinnacle Health Harrisburg with the chief complaint of high blood sugar. (R. 329.) By history, she reported she had type 1 diabetes and sought evaluation for symptoms of vomiting and hypoglycemia since the previous night. (*Id.*) Plaintiff stated she did not take her insulin as prescribed because of insurance

problems and she had been admitted to the hospital a month earlier due to diabetic ketoacidosis. (*Id.*) Included in the differential diagnosis section of the report were pancreatitis, hyperglycemia, and diabetic ketoacidosis. (*Id.*) The final diagnosis was poorly controlled diabetes mellitus. (*Id.*) Hospital records indicate there was a plan for Plaintiff to meet with a social worker to help with medication issues. (R. 330-31, 33.) She was also directed to follow up with Hamilton Health Center as soon as possible. (R. 333.)

Plaintiff was seen at Hamilton Health by Burhanuddin Farooqi, M.D., on January 23, 2015, for medication refill and complaints of a cold. (R. 243.) Dr. Farooqi noted that Plaintiff had diabetes mellitus "without mention of complication" and that her goal was to keep fasting blood sugar under 130 and her A1C less than 6.5. (R. 243.) Dr. Farooqi also noted that he discussed diabetic diet with Plaintiff. (R. 244.)

Plaintiff was seen again on January 29, 2015, by Shiku Idress, D.O., at Hamilton Health with the chief complaint of "Medline xa." (R. 244.) The "Plan" was medication renewals with some changes. (*Id.*)

On February 27, 2015, Plaintiff presented to Pinnacle Health emergency room with the chief complaint of sore throat. (R. 323.) Doctor Notes state that Plaintiff reported that her sugars had been within normal range and she had no evidence of diabetic

ketoacidosis.  (R. 324.)

Plaintiff presented to the Pinnacle Health emergency room with abdominal pain on May 29, 2015, at 3:46 p.m.  (R. 312.)  Doctor Notes indicate Plaintiff complained of sharp epigastric pain and nausea which had started in the morning and felt like when she had pancreatitis in the past.  (*Id.*)  The May 29th  record shows that the disposition of the visit was that Plaintiff left the emergency room at approximately 8:16 p.m.  (*Id.*)

Plaintiff was seen on July 1, 2015, by Dr. Idress at Hamilton Health with the chief complaint of "Medline xa."  (R. 242.)  The "Plan" was medication renewals with some changes.  (*Id.*)

On July 3, 2015, Plaintiff complained of rib and back pain when she went to the Pinnacle Health emergency room.  (R. 304.) Plaintiff was diagnosed with pancreatitis (chronic) and instructed to follow up with her primary care provider in one to two days and return to the emergency room if her symptoms worsened.  (R. 304, 306.)

Plaintiff again sought emergency care at Pinnacle Health on July 14, 2015.  (R. 257.)  She was found to be in diabetic ketoacidosis, was given IV fluids, and admitted for further evaluation and treatment.  (*Id.*)  Doctor Notes state that Plaintiff was warned about not taking her insulin, she realized this, and she had been in the situation before.  (*Id.*)

On August 29, 2015, Plaintiff presented to the emergency room

4

with high blood sugar.  (R. 294.)  By history, the provider reported that Plaintiff frequented the emergency room with diabetic ketoacidosis but this time she said she had been taking her medication as prescribed.  (*Id.*)  Plaintiff was again admitted with this diagnosis although she had earlier tried to sign out against medical advice.  (R. 296.)  Doctor notes indicate that Plaintiff was concerned because she had a party to go to but medical personnel convinced her of the seriousness of her condition and she agreed to be admitted.  (R. 296.)

Plaintiff was admitted to Reading Health on October 29, 2015, with a diagnosis of diabetic ketoacidosis and discharged on November 2, 2015, with the same diagnosis.  (R. 392.)  The provider noted Plaintiff had recently relocated from Harrisburg and she said she was taking her insulin but she had not checked her blood glucose.  (R. 392, 396.)  Other notes indicate she had lost her glucometer when she moved from Harrisburg and she was not taking her coverage insulin.  (R. 404.)  Endocrinology consultation records show that Plaintiff admitted she had missed insulin doses. (R. 399.)  Historically, Plaintiff reported diabetes since age ten, she had been on insulin therapy for years, and she did not take her diabetes medications regularly.  (*Id.*)  Notes also state that Plaintiff did not adhere to good food choices for diabetes control and she had last seen a diabetes educater "a while ago."  (R. 399.) Although "complications of diabetes" were noted, they were not

specifically identified.  (*Id.*)  Symptom evaluation was negative, including weight change, blurred vision, numbness, tingling, and myalgia.  (*Id.*)

On reference of Surendra Sivarajah, M.D., Plaintiff had a follow-up visit at Reading Health on November 17, 2015, with Rondelle Longnecker, CRNP.  (R. 452-57.)  Notes repeat the testing and medication dosage problems Plaintiff had experienced before her hospitalization and state that Plaintiff reported she had not missed doses or had hypoglycemic episodes since then.  (R. 452-53.) Plaintiff also reported she had diabetes education about one year earlier, timing of her meals was unpredictable, she had not been doing home blood glucose readings regularly due to not having strips, and she had no retinopathy or foot problems.  (R. 456.)  An extensive Plan was recorded which included patient counseling, education, and coordination of care.  (R. 456-57.)

On March 27, 2016, at 7:15 p.m. Plaintiff was seen at the emergency room at Pinnacle Health Harrisburg with the chief complaint of a boil on her head.  (R. 505.)  Doctors notes indicate Plaintiff was hyperglycemic on arrival and she was given insulin with IV fluids.  (R. 507.)  Her lab work showed possible early diabetic ketoacidosis, and a note at 2:16 a.m. on March 28th indicates that admission was required for watch of blood sugars and symptom evaluation.  (*Id.*)  At 3:05 a.m., Plaintiff decided she wanted to leave.  (*Id.*)  The Doctors Notes state that Plaintiff

understood the risk of leaving and she signed "against medical advice paperwork." (*Id.*)

On April 6, 2016, Plaintiff again was seen at Pinnacle Health emergency room. (R. 482.) She complained of nausea, vomiting, diarrhea, and diffuse abdominal discomfort for one day. (*Id.*) Because she failed to sufficiently improve, Plaintiff was transferred to the ED observation unit for additional testing to determine the need for admission versus the safety of discharge. (R. 484.) Plaintiff was discharged the next morning with a final diagnosis of tachycardia and dehydration. (R. 482, 494.) Plaintiff said she had a follow-up appointment with her primary care physician to maintain her home insulin and she was to be given an endocrinology referral. (R. 494.)

Plaintiff was admitted to Pinnacle Health ICU on May 23, 2016, with diabetic ketoacidosis identified as the highest priority diagnosis on admission. (R. 470.) History notes reference frequent admissions with DKA, pancreatitis, hypertension and HLD. (R. 471.) On admission, Plaintiff claimed she had been taking her medication as prescribed but she had run out of insulin the preceding night and didn't take a night or morning dose. (*Id.*) She had a doctor's appointment scheduled for that morning to get more insulin but felt too sick to go so she went to the emergency room instead. (*Id.*) Plaintiff was discharged on May 29, 2016, with discharge diagnoses of Diabetes type 1, acute pancreatitis,

HLD, and HTN.  (R. 470-71.)

On June 2, 2016, Plaintiff was seen by Dr. Idriss at Hamilton Health "for routine diabetes exam after she was away for almost one year."  (R. 523.)  By history, Plaintiff presented no new complaints and reported that she was not feeling tired or poorly. (*Id.*)

On August 8, 2016, Plaintiff was seen at the Pinnacle Health emergency room for left foot pain which she said developed after she jumped off a rope into a river and landed on her left foot two days earlier.  (R. 465, 466.)  Physical examination findings include the notation of ecchymosis on the left foot and toes.[1]  (R. 466.)

Hamilton Health records indicate Plaintiff had an encounter with Dr. Idriss on November 16, 2016, with the recorded chief complaint of "Medline bb."  (R. 523.)  Beyond medication notes and renewals, no additional information is provided.  (*Id.*)

Plaintiff was seen at the emergency department at Chambersburg Hospital on November 18, 2016.  (R. 518.)  Notes indicate that Plaintiff had nausea, vomiting, diarrhea, body aches, and chills which the provider thought were likely viral in nature.  (R. 519.) The provider also reported that Plaintiff felt light headed with positional changes, was tachycardic, and clinically appeared

---

[1]  "Ecchymosis" is the medical term for the common bruise. https://www.healthline.com/health/ecchymosis.

dehydrated. (*Id.*) The provider noted that ten minutes after evaluation, Plaintiff (who lived one and a half hours away) said her ride had arrived and she did not want to wait for IV fluids and laboratory analysis. (R. 520.) Based upon basic lab results, the provider expressed concern for dehydration with renal insufficiency as well as leukocytosis. (*Id.*) He explained his concern to Plaintiff that it was unsafe for her to leave but she said she must. (*Id.*) She was given medications and instructions to follow up before being discharged against medical advice. (*Id.*)

Hamilton Health records indicate Plaintiff had another encounter with Dr. Idriss on December 9, 2016, with the recorded chief complaint of "Medline jd." (R. 522.) Beyond medication notes and renewals, no additional information is provided. (*Id.*)

## B. *Hearing Testimony*

At the outset of the hearing on February 17, 2017, ALJ Cutter asked if there was anything outstanding that he needed before he made his decision. (R. 25.) Plaintiff's attorney responded that he did not think so except perhaps something related to employment which could be cleared up by reference to other records and Plaintiff's testimony. (*Id.*) At the end of the hearing, Plaintiff's attorney reiterated that there was nothing he wanted to add. (R. 36.)

Plaintiff testified that her diabetes affected her ability to work because her sugar levels would be low or high while she was at

work which would require her to eat snacks, take extra breaks, and frequently use the bathroom.  (R. 27.)  She added that  employers were "really picky" about the snacking and didn't approve of the necessary breaks.  (*Id.*)

Upon questioning by her attorney, Plaintiff said her blood sugars were high about two to three times per month.  (R. 28.)  She explained that ever since she had been in the hospital she started taking care of herself, did not eat as much junk food, and watched what she ate but still got the high sugar level two to three times per month.  (*Id.*)  Plaintiff said high readings (400-500) made her feel dizzy, thirsty, and nauseous and she sweated a lot.  (*Id.*)  She added that she got more lows than highs, estimating that the low readings occurred three to five times a month.  (R. 28-29.)  In addition to feeling shaky and dizzy, Plaintiff said low levels (30-40) made her feel immobile and someone else would have to give her something to bring the level up.  (R. 29.)

Plaintiff also testified that her blood pressure caused problems in that it was either high or low, her pulse was very high and she was unable to stand or walk for a long time because she felt like she was going to pass out.  (R. 27.)  She said that episodes of high blood pressure happened every day when she woke up, adding that it lasted for about half an hour after she took her medication.  (R. 30.)  She testified that the low blood pressure issue was rare.  (*Id.*)  Plaintiff's attorney asked her if there was

"anything else in terms of symptoms," and Plaintiff said there was not.  (R. 31-32.)

Plaintiff described her daily activities at the time of the hearing to include cleaning, cooking, watching TV, and "sleep all day mostly."  (*Id.*)  She estimated that she could probably clean for an hour or two before she would start getting light headed, her pulse started "acting up," and her heart started racing.  (R. 31.)

When asked whether she had seen anyone other than Dr. Idriss at Hamilton Health, Plaintiff responded that she had not.  (R. 31.)

### 3. *ALJ Decision*

With his March 13, 2017, Decision, ALJ Cutter determined that Plaintiff had the severe impairment of type 1 diabetes mellitus. (R. 11.)  He found that Plaintiff had other medical conditions which were not severe: left foot injury; hypertension; acute pancreatitis; and a tibia fracture.  (R. 24.) ALJ Cutter based the non-severe finding on his determination that there was no evidence Plaintiff had symptoms related to these conditions that persisted for twelve months or that they would affect Plaintiff's ability to perform basic work activities.  (R. 12.)  After finding that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment, ALJ Cutter determined she had the residual functional capacity ("RFC") to perform medium work except she could not perform work at unprotected heights, contact moving mechanical parts, or operate motor vehicles.  (R. 12.)  ALJ

Cutter next alternatively found Plaintiff could perform her past relevant work as a fast foods worker as actually and generally performed or she could perform other jobs which existed in significant numbers the national economy. (R. 14-15.) Based on these findings, the ALJ concluded that Plaintiff had not been under a disability as defined in the Social Security Act from August 28, 2015, through the date of the decision. (R. 16.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[2] It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the

---

[2] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step four and alternatively at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform her past relevant work as actually and generally performed, and she could

13

perform jobs that existed in significant numbers in the national

economy.  (R. 14-16.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is

limited to determining whether there is substantial evidence to

support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft*

*v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence

means "more than a mere scintilla.  It means such relevant evidence

as a reasonable mind might accept as adequate to support a

conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see*

*also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third

Circuit Court of Appeals further explained this standard in *Kent v.*

*Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a
> talismanic or self-executing formula for
> adjudication; rather, our decisions make
> clear that determination of the existence *vel*
> *non* of substantial evidence is *not* merely a
> quantitative exercise.  A single piece of
> evidence will not satisfy the substantiality
> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social

> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted). If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*,

181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where a claimed error would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

### IV. Discussion

As set out above, Plaintiff asserts the ALJ erred on the following bases: 1) substantial evidence does not support the step two determination; 2) the RFC assessment is not supported by substantial evidence; 3) substantial evidence does not support the evaluation of Plaintiff's diabetes; 4) substantial evidence does not support the step four evaluation; and 5) the ALJ's multiple symptom evaluation errors require reversal. (Doc. 9 at 2.)

A. *Step Two*

Plaintiff first argues that substantial evidence does not

16

support the ALJ's step two determination that her left foot injury, hypertension, acute pancreatitis, and tibia fracture are non-severe impairments. (Doc. 9 at 7 (citing R. 12).) Defendant responds the ALJ correctly found these impairments to be non-severe. (Doc. 10 at 11.) The Court concludes Plaintiff has not shown that the alleged error is cause for reversal or remand.

The regulations provide that an impairment will be deemed a medically determinable physical or mental impairment when it results "from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Therefore, a physical or mental impairment must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. §§ 404.1521, 416.921. The regulations further provide that a claimant's "statement of symptoms, a diagnosis, or a medical opinion" will not be used to establish the existence of an impairment. *Id.* Once a medically determinable impairment is found, the determination is made whether it is severe. *Id.* An impairment or combination of impairments is not severe "if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1522, 416.922.

If the sequential evaluation process continues beyond step two, a finding of "not severe" regarding a specific impairment at step two may be deemed harmless if the functional limitations

associated with the impairment are accounted for in the RFC. *Salles v. Commissioner of Social Security*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) (not precedential) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)). In other words, because the outcome of a case depends on the demonstration of functional limitations rather than a diagnosis, where an ALJ identifies at least one severe impairment and ultimately properly characterizes a claimant's symptoms and functional limitations, the failure to identify a condition as severe is deemed harmless error. *Garcia v. Commissioner of Social Security*, 587 F. App'x 367, 370 (9th Cir. 2014) (citing *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007)); *Walker v. Barnhart*, 172 F. App'x 423, 426 (3d Cir. 2006) (not precedential) ("Mere presence of a disease or impairment is not enough[;] a claimant must show that his disease or impairment caused functional limitations that precluded him from engaging in any substantial gainful activity."); *Burnside v. Colvin*, Civ. A. No. 3:13-CV-2554, 2015 WL 268791, at *13 (M.D. Pa. Jan. 21, 2015); *Lambert v. Astrue*, Civ. A. No. 08-657, 2009 WL 425603, at *13 (W.D. Pa. Feb. 19, 2009).

Here Plaintiff merely reiterates certain medical evidence in support of the claimed error. (Doc. 9 at 8-9; Doc. 11 at 1-2.) She does not refute ALJ Cutter's assessment that hypertension was controlled with conservative treatment, the fracture and left foot injury did not satisfy the regulatory durational requirement, and

the pancreatitis only caused minimal symptoms. (*See* R. 12.)
Within the relevant legal framework set out above, sporadic
treatment for a condition or related symptom does not establish
severity. *See supra*.

Assuming *arguendo* that the impairments identified were severe,
Plaintiff does not show that the error was harmful. This case was
decided alternatively at step four or step five so the relevant
question is whether Plaintiff has shown that ALJ Cutter did not
properly characterize her symptoms and functional limitations.
*See*, *e.g.*, *Garcia*, 587 F. App'x at 370. Plaintiff does not even
attempt to make the required showing in the context of this claimed
error. Therefore, the Court concludes Plaintiff has not satisfied
her burden of showing error on the basis alleged.

**B.    *RFC Assessment***

Plaintiff contends the record contains no support for the
ALJ's RFC assessment because the record does not contain an RFC
assessment from any physician. (Doc. 9 at 10.)

Plaintiff first asserts the ALJ "erred by inferring treating
physician's silence regarding [her] functional limitations to mean
that she is not disabled." (Doc. 9 at 10 (citing *Barton v. Colvin*,
Case No. 3:13-CV-1199(GTS) (N.D.N.Y. Sept. 15, 2015)).) When
considered in context, ALJ Cutter's statement that "[d]espite the
claimant's allegations of disabling limitations, there is no
opinion from a treating provider to suggest the claimant's

impairments preclude her from work activity" (R. 14) does not make the inference suggested. The statement comes after the ALJ reviewed Plaintiff's subjective complaints, summarized relevant medical records, and explained the basis for his RFC. (R. 13-14.) As such, ALJ Cutter's comment is merely a statement of fact: Plaintiff alleged disabling symptoms and no opinion of a treating source suggested her impairments precluded her from work activity. Were it the only reason provided, the statement might be characterized as an improper inference but that is not the case here. Thus, Plaintiff has not met her burden of showing error on the basis of the alleged inference.

Plaintiff also states that the "relative lack of opinion evidence in the file" triggered the ALJ's duty to develop the record by sending Plaintiff for a consultative examination. (Doc. 9 at 11; Doc. 11 at 3.) Defendant responds that an ALJ need not rely on a medical opinion to make a disability determination or require an ALJ to seek outside expert assistance. (Doc. 10 at 16.)

The ALJ has the final responsibility to make a disability determination. 20 C.F.R. § 404.1527(d), 416.927(d). In making this determination, an ALJ has a duty to develop a full and fair record. *Boone v. Barnhart*, 353 F.3d 203, 208 n.11 (3d Cir. 2004). Although the duty does not relieve the claimant of her burden of proof, *Hess v. Sec'y of Health, Education, and Welfare*, 497 F.2d 837, 840 (3d Cir. 2005), an ALJ "must secure relevant information

regarding a claimant's entitlement to benefits," *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995). It is "incumbent upon the [ALJ] to secure additional evidence needed to make a sound determination." *Ferguson v. Schweiker*, 765 F.2d 31, 36 (3d Cir. 1985). The requirement does not necessarily come into play where "there was sufficient evidence in the medical records for the ALJ to make her decision." *Moody v. Barnhart*, 114 F. App'x 495, 501 (3d Cir. 2004) (not precedential); *see also Griffin v. Commissioner of Social Security*, 303 F. App'x 886, 890 n.5 (3d Cir. 2009) (not precedential). If the record is inadequate for proper evaluation of the evidence, the ALJ's duty to develop the record is triggered. *See, e.g.*, *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001). "Ultimately, the question is whether the administrative record has been adequately developed under the circumstances to provide a substantial basis for the decision." *Yerk v. Astrue*, No. 2:07-CV-1601, 2009 WL 185991, at *8 (W.D. Pa. Jan. 26, 2009 (citing *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)).

Here the ALJ explained the basis for his RFC determination with specific citation to the record. (R. 12-14.) With this claimed error, Plaintiff does not undermine the ALJ's analysis but conclusorily states that the lack of opinion evidence required ALJ Cutter to obtain a consultative examiner opinion. (Doc. 9 at 11; Doc. 11 at 3.) Plaintiff's conclusion that such an opinion was required is not supported by citation or argument. (*See id.*) Such

a requirement is not found in the applicable legal framework nor did Plaintiff's attorney suggest that a consultative exam, or any additional evidence whatsoever, would be advisable in this case. Rather, at the end of ALJ hearing, Plaintiff's attorney verified that there was nothing more and earlier in the hearing made no mention of the need for a consultative examination when asked about the state of the record relative to the ALJ determination. (R. 25, 36.)

Because Plaintiff has not shown that the two assertions advanced in support of this claimed error are consistent with the record or relevant authority, the Court concludes Plaintiff has not satisfied her burden of showing error on the basis alleged.

## C.    *Diabetes Evaluation*

Plaintiff next alleges that substantial evidence does not support the ALJ's evaluation of her diabetes because he failed to properly consider the impact of the impairment on Plaintiff's ability to work. (Doc. 9 at 11-13.) Defendant responds that substantial evidence supports the ALJ's evaluation of this impairment. (Doc. 10 at 18-20.) The Court concludes Plaintiff has not shown error on the basis alleged.

In support of her argument Plaintiff points to four hospitalizations from August 29, 2015, to May 23, 2016, diabetic neuropathy considerations, and her previous experience of her employer's tolerance for her need to snack and use the bathroom.

22

(Doc. 9 at 12-13.)  In her reply brief, Plaintiff adds that the ALJ made a mistake of fact which she correlates with the assertion that "type 1 diabetes by definition means that an individual is insulin dependent and her diabetes cannot be controlled with diet and exercise."  (Doc. 11 at 3-4 (citing https://www.mayoclinic.org/diseases-conditions/type-1 diabetes/symptoms-causes/syc-20353011?p=1).)

First, Plaintiff's reference to diabetic neuropathy does not undermine ALJ Cutter's analysis of her diabetes.  (*See* Doc. 9 at 12.)  Importantly, she does not point to any record evidence of neuropathy.  (*See id.*)  Further, although she notes the link between diabetic neuropathy and kidney damage, she does not show how the single November 18, 2016, diagnosis "acute renal insufficiency" establishes anything more or greater limitations than those assessed.  (*Id.*)

Regarding hospitalizations and job difficulties related to the condition, a review of ALJ Cutter's decision reveals that Plaintiff has not shown error on these bases.  After referencing Plaintiff's hospitalization "due to uncontrolled sugar levels, which has caused work absences and termination of her employment,"  (R. 13 (citing Exs 16B, 4E, 11E)), ALJ Cutter's discussion of Plaintiff's diabetes included the following:

> The claimant's medical records reveal a history of type 1 diabetes mellitus with hospitalizations for exacerbations, but her treatment records suggest that her condition

can be controlled with appropriate diet and
medications (Exhibits 5F, 7F, 9F, 10F). The
evidence corroborates that she experiences
intermittent lightheadedness, nausea,
diarrhea, and vomiting with exacerbations of
diabetic ketoacidosis, but there is no
evidence of chronic hyperglycemia, end-organ
damage, heart failure cardiovascular disease,
peripheral vascular disease, stroke,
cognitive impairments, slow-healing bacterial
and fungal infections, gastroparesis and
ischemic bowel disease (intestinal necrosis),
chronic symptomatic hypo/hyperglycemia,
amputation, diabetic retinopathy, peripheral
neuropathy or other diabetic-related
complications (Exhibits 5F, 7F, 9F, 10F).
Although the claimant has required
hospitalization for exacerbations (i.e.
hypoglycemia and diabetic ketoacidosis), the
claimant's treatment generally includes
routine medical examinations, oral
medication, daily insulin, weight loss and
diet (Exhibits 5F, 7F, 9F, 10F/2-3, 13, 22).
. . . Records do not show significantly high
or low blood sugar levels with treatment
compliance (Exhibits 2F, 5F). Notably, her
treatment records from Hamilton Health Center
in June 2016 reveal that she presented with
no new complaints (Exhibit 10F/3).
Specifically, she reported that she was not
feeling tired or poorly and that she had no
headaches or other significant symptomology
(Exhibit 10F/3). This evidence supports that
her symptoms can be managed with appropriate
medical treatment.

(R. 13.) ALJ Cutter added that the record did not document

persistent symptoms of frequent urination and evidence was not

consistent with Plaintiff's "allegations that she is essentially

unable to function due to blood sugar fluctuations." (R. 14.)

This review shows that ALJ Cutter discussed Plaintiff's

hospitalizations and the job difficulties she experienced related

to her diabetes.  Moreover, Plaintiff does not address ALJ Cutter's determination that records did not show "significantly high or low blood sugar levels with treatment compliance" and the "record suggests that her condition can be controlled with appropriate diet and medications." (R. 13.)  In her supporting brief, Plaintiff does not discuss these findings at all. (*See* Doc. 9 at 12-13.)  In her reply brief Plaintiff infers that ALJ Cutter's statement that the records suggest her diabetes can be controlled with appropriate diet and medications (R. 13) is an error of fact requiring reversal because by definition diabetes type 1 requires insulin and cannot be controlled with diet and exercise. (Doc. 11 at 3-4.)  Nothing in the ALJ's assessment contradicts the definition of type 1 diabetes Plaintiff provides: he *did not* find that her diabetes was controlled with diet and exercise but with "appropriate diet and *medications*" and that her treatment included daily insulin. (R. 13 (emphasis added).)  Thus, Plaintiff has not satisfied her burden of showing how the ALJ erred in his consideration of her diabetes.

## D. Step Four Evaluation

Plaintiff maintains the ALJ erred in his determination that she could return to her past relevant work because he did not take specific testimony about the physical and mental demands of her past work as a fast food worker. (Doc. 9 at 13.)  Defendant responds that the ALJ made proper findings on this issue. (Doc. 10 at 20.)  The Court concludes Plaintiff has not satisfied her burden

of showing error on the basis alleged

In her supporting and reply briefs, Plaintiff addresses the step four determination regarding her position as actually performed. (Doc. 9 at 13-14; Doc. 11 at 4-5.) However, ALJ Cutter found that Plaintiff could perform her past relevant work as "actually and generally performed." (R. 15.) Therefore, even assuming *arguendo* that Plaintiff points to error regarding her job as specifically performed, she has not presented evidence of error regarding the job as generally performed. Therefore, the alleged error would be harmless and not present cause for reversal or remand. The alleged error would also be harmless because ALJ Cutter made an alternative step five determination that other jobs existed in significant numbers in the national economy that Plaintiff could perform. (R. 15.)

**E.    *Symptom Evaluation***

Plaintiff presents several bases for this claimed error, criticizing ALJ Cutter's decision regarding symptom evaluation as follows: he erred in noting that Plaintiff's condition could be "controlled with diet and medication" and in considering what type of diabetes can be controlled with diet and exercise; he did not adequately consider Plaintiff's hospitalizations; he incorrectly relied on a lack of clinical findings; and he did not properly consider activities of daily living. (Doc. 9 at 15-17.) Defendant responds that the ALJ properly considered Plaintiff's subjective

26

complaints. (Doc. 10 at 23-26.) The Court concludes Plaintiff has not satisfied her burden of showing error on the bases alleged.

Regarding the ALJ's determination that the records suggested that Plaintiff's diabetes could be controlled with appropriate diet and medications, Plaintiff points to the *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000) in support of the proposition that having a controlled condition does not mean that the claimant is not disabled. (Doc. 9 at 15.) While this proposition may be true, Plaintiff has not shown how her condition, when controlled, renders her disabled. (*Id.*) Her series of conclusory statements do not add up to a cohesive argument with citation to the record demonstrating that substantial evidence does not support the ALJ's determination that Plaintiff's diabetes can be controlled and, when controlled, the condition does not render her disabled within the meaning of the act. Therefore, Plaintiff has not shown error related to the ALJ's statement.

Plaintiff's assertion about hospitalizations is conclusory and unavailing in that she presents absolutely no argument or evidence as to how the ALJ "downplayed" her hospitalizations or the specific significance of her hospitalizations in establishing that she was disabled within the meaning of the Social Security Act. (*See* Doc. 9 at 15.)

Plaintiff's reiteration of the definition of type 1 diabetes (*id.*) is unavailing for the reasons discussed in a previous section

of this Memorandum: it is conclusory and presents an inaccurate inference. *See supra* p.25.

Plaintiff links her assertion regarding the ALJ's notation of a lack of objective or clinical findings to discredit her subjective reports to the principle that "a claimant's testimony cannot be disregarded simply because it is not supported by objective medical evidence." (Doc. 9 at 16 (citing SSR 96-7p).) Plaintiff's reference to SSR 96-7p does not support the claimed error because her statement of error is conclusory and inaccurate. Social Security Ruling 96-7p provides the following guidance regarding the evaluation of a claimant's statements about his or her symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p. A fair reading of ALJ Cutter's decision shows that he he did not rely solely on a lack of objective or clinical findings to discredit Plaintiff but rather compared her subjective complaints to clinical findings and other subjective reports she

had provided. (R. 13-14.) Although he noted that the record did not document certain symptoms (R. 14), ALJ Cutter considered the entire case record in determining Plaintiff's subjective statements regarding her symptoms were not completely credible. (*See* R. 13-14.)

Finally, Plaintiff's claimed error regarding her activities of daily living is unavailing in that she bases her assertion on the principle that "limited activities, generally preformed in the privacy of one's own home, are not on [sic] any way inconsistent with [her] assertion that she cannot perform work activities, 8 hours a day, 5 days a week." (Doc. 9 at 16.) As noted by Defendant, Plaintiff reported activities beyond what she did at home and the record showed that she engaged in a wide variety of activities, including various outings with friends. (*See* Doc. 10 at 25-26 (citing R. 184, 202-04).) In her reply brief, Plaintiff generally reiterates her initial argument but does not refute that she engaged in a wide variety of activities with friends. (Doc. 11 at 6.) Moreover, Plaintiff does not address the specific correlation ALJ Cutter made between her ability to "perform a wide range of activities of daily living" (R. 14 (providing examples)) and "allegations that she is essentially unable to function due to blood sugar fluctuations" (*id.*). Thus, Plaintiff has not satisfied her burden of showing error on the basis alleged.

## **V. Conclusion**

For the reasons discussed above, the Court concludes that Plaintiff's appeal of the Acting Commissioner's decision is properly denied.  An appropriate Order is filed simultaneously with this Memorandum.


                                        S/Richard P. Conaboy
                                        RICHARD P. CONABOY
                                        United States District Judge


DATED: February 6, 2018